[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1378 
Defendant Paul Crigler appeals from both the judgment of the trial court on the jury verdict in favor of the plaintiffs' against him, and the trial court's judgment notwithstanding the verdict in favor of defendant Collateral Control on its cross-claim against him.
Plaintiffs, farmers who reside in Baldwin County, sued Collateral Control Corp. (Collateral Control), Paul Crigler, the principal owner of Modern Mix, Inc. (Modern Mix), and Birmingham Trust National Bank (BTNB), seeking compensatory and punitive damages for alleged conversion, fraud, conspiracy, negligence of a warehouseman, and wantonness of a warehouseman in committing fraud and converting personal property. Collateral Control cross-claimed against Crigler for indemnity based on a written indemnity agreement. The jury returned a verdict in the amount of $715,176 against Collateral Control and Paul Crigler and a verdict for Paul Crigler on Collateral Control's cross-claim against him. The trial court granted Collateral Control's motion *Page 1379 
for judgment notwithstanding the verdict on the cross-claim against Crigler.
Plaintiffs stored grain in bins owned by Modern Mix. Plaintiffs testified that they stored their grain on a "stored unpriced" basis and received weight tickets to that effect. According to plaintiffs, when they designated that they wished to have their grain "stored unpriced," they retained an option either to sell the grain to Modern Mix in the future, at a price offered by Modern Mix, or to obtain a return of their grain, or grain of similar grade or quality, when they desired. Plaintiffs paid a storage fee up until the time that they told Modern Mix to sell the grain.
BTNB extended a line of credit to Modern Mix, which was to be secured by Modern Mix inventory. Collateral Control provides services to lending institutions which lend against inventory or stock in trade. Collateral Control established an inventory certification control system and, under its agreements with Modern Mix and BTNB, was obligated to monitor the flow of inventory at Modern Mix and to report regularly to BTNB. The amount of company-owned inventory certified by Collateral Control to BTNB, at least theoretically, determined the amounts BTNB loaned to Modern Mix. Modern Mix transferred two employees to Collateral Control's payroll to act as "bonded agents" at the Modern Mix premises to monitor the flow of inventory. Modern Mix also leased its grain storage bins to Collateral Control.
Modern Mix suffered business setbacks in the fall of 1979. Paul Crigler testified that Modern Mix sold the grain and put the proceeds into its checking account. BTNB appropriated the proceeds of Modern Mix's accounts receivable for the repayment of loans which it had made to Modern Mix. Modern Mix repaid BTNB approximately $575,000 in the period from August 13, 1979, to November 13, 1979. By letter dated June 23, 1980, Modern Mix informed plaintiffs that there were no funds to pay them for their grain. Thereafter, Modern Mix filed a petition in bankruptcy in the fall of 1980.
We must initially consider the nature of the transaction in question. If the transactions were sales with passage of title, then there could be no recovery against Crigler under the theories of conversion, fraud, negligence, or wantonness of a warehouseman. This Court considered a similar arrangement inNYTCO Services, Inc., v. Wilson, 351 So.2d 875 (Ala. 1977). In that case, the weight tickets received by plaintiffs indicated that their grain was being stored. In addition, plaintiffs had the option to require a return of the grain or to sell the grain. The Court in that case concluded that the transaction was a bailment. 351 So.2d at 879. We likewise find the transaction in the present case to be a bailment. It follows that the sale of the grain by Modern Mix was an unlawful conversion thereof to its own use, for which an action will lie. The question we must address relates to the individual responsibility of Crigler.
Defendant Crigler first claims that the trial court erred in denying his motion for directed verdict on the ground that his individual liability was not established. He later asserts that the trial court erred in granting a judgment notwithstanding the verdict on the cross-claim for indemnity. We address the lack of individual liability claim first because of its relationship to the issue of whether the trial court erred in granting the judgment notwithstanding the verdict on the cross-claim.
In deciding if Crigler's motion for directed verdict on the issue of individual liability was due to be granted, the trial court must view the evidence most favorably to the non-moving party, and if by any reasonable interpretation, it can support an inference of individual liability the nonmoving party seeks to prove, the motion must be denied. Wadsworth v. Yancey Bros.Co., 423 So.2d 1343, 1345 (Ala. 1982). There is evidence that would support the inference of personal liability of Crigler as to each count in the complaint.
It is well-established that a director of a corporation "may not participate in a *Page 1380 
tort perpetrated through the agency of a corporation, or in a fraudulent injury to another, without being civilly responsible." Rudisill Soil Pipe Co. v. Eastham Soil Pipe Foundry Co., 210 Ala. 145, 150, 97 So. 219 (1923). See, AlabamaMusic Co. v. Nelson, 282 Ala. 517, 213 So.2d 250 (1968); Roanv. McCaleb, 264 Ala. 31, 84 So.2d 358 (1956); Finnell v. Pitts,222 Ala. 290, 132 So. 2 (1930); Chandler v. Hunter,340 So.2d 818 (Ala.Civ.App. 1976). Fletcher's Cyclopedia of Corporations, § 1135, at 202-203 (1975), explains the rule as follows:
 "It is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance — as fraud, conversion, acts done negligently, etc. — notwithstanding he may have acted as the agent or under directions of another. And this is true to the full extent as to torts committed by the officers or agents of a corporation in the management of its affairs. The fact that the circumstances are such as to render the corporation liable is altogether immaterial. . . . Corporate officers are liable for their torts, although committed when acting officially. In other words, corporate officers, charged in law with affirmative official responsibility in the management and control of corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval."
This rule does not depend on the same grounds as "piercing the corporate veil," that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with the formalities of corporate organization. See L.C.L.Theatres v. Columbia Pictures Indus., 619 F.2d 455 (5th Cir. 1980).
In order to hold an officer of a corporation liable for the negligent or wrongful acts of the corporation, "there must have been upon his part such a breach of duty as contributed to, or helped bring about, the injury; that is to say, he must be a participant in the wrongful act." Fletcher's Cyclopedia ofCorporations, § 1137 at 208. It is the opinion of this Court that the evidence in this case is sufficient to connect Crigler with the conversion of plaintiffs' grain.
Defendant Crigler testified that the controlling interest in Modern Mix was owned by him and his father, that his father retired in 1976 or 1977, and that Crigler himself was president of Modern Mix and managed the business. The evidence indicates that Crigler made the decisions regarding acceptance of grain and sales of grain for Modern Mix. Both Crigler and a number of the plaintiffs testified that Crigler occasionally unloaded plaintiffs' grain. Crigler testified that he signed some of the collateral certificates prepared by Collateral Control. Crigler admitted that farmer-owned grain was certified to BTNB. The record also reveals that Modern Mix accepted plaintiffs' grain but never paid plaintiffs for it and that Modern Mix sold the grain and deposited the proceeds in its account. Furthermore, the evidence indicates that Crigler acquiesced in BTNB's takeover of the financial aspect of the business for the reduction of the loan balance. The evidence is sufficient to show that Crigler, in managing Modern Mix, authorized, directed, or actively participated in the wrongful conduct,i.e. the conversion of plaintiffs' grain.
Plaintiffs' complaint, as amended, alleges that defendant Crigler is liable to them under § 6-5-102, Code 1975, which provides:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relationship of the parties or from the particular circumstances of the case."
Under § 6-5-102, an obligation to communicate material facts may arise from a confidential relationship or from the particular facts of the case. Harrell v. Dodson, *Page 1381 398 So.2d 272 (Ala. 1981). A bailment has been defined as:
 "[T]he delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished or kept until the bailor reclaims it."
Farmer v. Machine Craft, Inc., 406 So.2d 981 (Ala.Civ.App. 1981), quoting 8 Am.Jur.2d Bailments § 2 (1980). See 8 C.J.S.Bailments § 1 (1962). We believe that a bailor/bailee relationship gives rise to a duty to disclose under § 6-5-102.
A "material fact" under § 6-5-102 is a fact of such a nature as to induce action on the part of the complaining party.Cooper v. Rowe, 208 Ala. 494, 94 So. 725 (1922). The material fact suppressed by Crigler, according to plaintiffs' amended complaint, is that Crigler accepted plaintiffs' grain at a time when he knew that Modern Mix was in financial trouble and would be unable to pay for the grain or return grain of a like quality and quantity.
In Harrell v. Dodson, 398 So.2d 272 (Ala. 1981), we stated that as a matter of law one can only be liable for concealing facts of which one has knowledge. In the present case, one plaintiff testified that he delivered grain to Modern Mix in the fall of 1978 and 1979, while the remaining plaintiffs testified that they delivered grain to Modern Mix in the fall of 1979. Plaintiffs were subsequently informed by Modern Mix that it would not pay for or return the grain. The issue becomes whether Crigler had knowledge of Modern Mix's financial situation at the time he accepted plaintiffs' grain.
Crigler testified that he first learned that things were not going well for Modern Mix when he received a financial statement from his accountant in August 1979. A 1979 financial statement showed current assets at $554,449.12 and current liabilities at $961,254.72. The report showed retained earnings at a negative $238,718.26 and current year earnings at a negative $69,035.35. The report also listed liability for stored grain at $430,466.55. A Dunn and Bradstreet Report on Modern Mix dated August 15, 1978, stated:
 "In a communication received April 17, 1978, signed by Paul Crigler, President, it was indicated this business lost money for the past six (6) months."
Crigler testified that poor farming conditions in 1976-77, rising interest rates during the period in question, and damage from Hurricane Frederic in September of 1979 contributed to Modern Mix's problems. Crigler also testified that BTNB took control over Modern Mix's checking account after the hurricane.
The collateral certificates signed by Crigler on the following dates provide the following figures for the loan balance and value of total certified inventory:
 TOTAL
 -----
 CERTIFIED LOAN
 --------- ----
 DATE INVENTORY BALANCE
 ---- --------- -------
 08-20-79 $377,161.39 $625,000
 09-17-79 252,280.80 550,000
 10-01-79 263,563.40 425,000
 10-15-79 320,693.59 425,000
 10-22-79* 323,418.43 275,000
 10-29-79 325,502.46 75,000
 11-19-79 172,507.42 50,000
* certificate signed by someone other than Crigler.

These figures indicate that $575,000 was repaid to BTNB in a period from August 20, 1979, to November 19, 1979. There is evidence in the record that, during the time that plaintiffs delivered their grain to Modern Mix, Modern Mix significantly reduced its debt to BTNB, although Modern Mix owned no appreciable amount of grain inventory. Although Crigler testified that Modern Mix owned grain in 1979, two witnesses testified that Modern Mix owned no grain in 1979. Crigler admitted that farmer-owned grain was being certified to BTNB. This evidence implies that Crigler knew about Modern Mix's poor financial situation, since he was apparently selling farmer-owned grain to pay Modern Mix's debt.
Viewed collectively, these facts could reasonably lead to the inference that Crigler *Page 1382 
knew of Modern Mix's financial instability and of its inability to pay for the grain at the time when the grain was received for storage, and therefore that he actively participated in the fraud.
We believe that the facts mentioned previously are sufficient to indicate Crigler's participation in the misapplication of the plaintiffs' grain or the proceeds from the sale of that grain and thus to support the jury verdict on the warehouseman count. It is undisputed that Modern Mix is a warehouseman under Code 1975, § 7-7-102 (1)(h). Section 7-7-204, Code 1975, provides that a warehouseman is liable for damages "caused by his failure to exercise such care . . . as a reasonably careful man would exercise under like circumstances." Crigler, in managing Modern Mix, made the decisions to sell plaintiffs' grain and to place the proceeds in an account controlled by BTNB. In addition, our Court of Civil Appeals has stated:
 "[W]here a bailee of goods for hire, upon demand made, fails to redeliver [the goods] or does not account for a failure to make delivery . . ., prima facie negligence will be imputed to him, and the burden of proving a loss without want of ordinary care is devolved upon him."
Anniston Lincoln-Mercury v. Mayse, 341 So.2d 949, 950
(Ala.Civ.App. 1977). Crigler did not meet this burden.
After reviewing the evidence, we are of the opinion that the trial court did not err in refusing to grant Crigler's motion for directed verdict on the basis that his individual liability had not been established. We conclude that there was sufficient evidence that Crigler directed or participated in the actions causing injuries to the plaintiffs, so that he can be held individually liable.
Crigler next asserts error in the trial court's refusal to grant his motion for a new trial, the alleged error being that the court failed to inform him of its proposed action on requested written instructions prior to arguments to the jury. At the end of the second day at trial, the court requested that counsel for the parties provide it with their requested charges. Counsel for plaintiffs had previously submitted jury charges. A colloquy between the court and counsel for Collateral Control and Crigler followed in response to the court's request for jury charges:
"MR. REEVES; I'll redo some [jury charges] tomorrow.
 "THE COURT: Okay. In the morning. And give it to me in the morning."
At the end of the testimony on the second day of trial, the judge informed the jury that they were to return at 9:00 a.m. on the following morning. Counsel for Collateral Control submitted 35 charges and counsel for Crigler submitted seven charges at 9:00 on that next morning. Subsequent to the submission of charges, the court allowed plaintiffs to proceed with closing arguments. Counsel for Crigler supposedly interposed an objection to the giving of closing arguments before the court had announced its action on the requested charges.
Rule 51, Ala.R.Civ.P., provides, in pertinent part:
 "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file and, in such event, shall serve on all opposing parties written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed."
We note initially that Rule 51, Fed.R.Civ.P., is identical to the relevant portion of Rule 51, Ala.R.Civ.P. The Fifth Circuit Court of Appeals noted, in construing Rule 51, Fed.R.Civ.P., that "[a]n essential purpose of Rule 51 is to permit counsel to argue effectively upon the evidence and to know in advance the guiding principles under which the argument should be made."Ebanks v. Southern Railway Co., 640 F.2d 675, 678 (5th Cir. 1981). See 5A Moore's Federal Practice ¶ 51.03 at 51-8. *Page 1383 
In construing the relevant portion of Rule 51, this Court inTrimble v. Bramco Products, Inc., 351 So.2d 1357 (Ala. 1977), stated:
 "Rule 51, ARCP, does require the court to inform counsel before argument of its action with respect to requested charges and the rule should be observed. However, its failure to do so does not mandate reversal unless the court refuses to follow the rule after its attention has been called to it or prejudice results therefrom."
351 So.2d at 1360.
In Trimble, the complaining party did not ask the court to inform him of the charges which it intended to give, nor did he show that any prejudice resulted from the court's failure to do so. In the present case, however, counsel for defendants Crigler and Collateral Control in their briefs maintain that they called the court's attention to its failure to inform the parties of its proposed action on jury charges at the beginning of oral argument. The record, however, does not disclose an objection. All that appears on the record is the trial court's refusal to take a recess so that the judge could read and rule on the requested charges. This Court will not reverse for the trial court's failure to rule on the charges unless a proper objection was made at that time. Trimble, 351 So.2d at 1360. Even if we considered that there had been a proper objection, we would, for other reasons, find no error in the trial court's action.
The requirements of Rule 51 are both plain and mandatory. Its purpose as an aid in the administration of justice is equally plain. We believe, that, under the circumstances of this case, reversing the trial court for its failure to inform the parties of its action on the jury charges prior to closing arguments would be contrary to the goal of promoting efficient trial practice. Counsel for defendants were aware, at the close of the second day of trial, that the court had scheduled closing argument at 9:00 a.m. The trial judge could reasonably have waited until the requested jury charges were in from both sides before ruling on either side's charges. In addition, it would be unfair to give the defendants the benefit of a ruling on the plaintiffs' proposed charges without giving the plaintiffs the benefit of a ruling on the defendants' charges. We are of the opinion in this case that counsel for defendants, in delaying submission of requested jury charges, effectively waived the right to be informed of the court's proposed action on plaintiffs' and defendants' charges prior to the time scheduled for oral argument. See, Burch v. Reading Co., 140 F. Supp. 136
(E.D.Pa. 1956).
Crigler also asserts error in the giving of certain charges, on the basis that the charges were abstract statements of law and not related to the evidence in this case.
Without addressing the issue of whether such an objection stated sufficient grounds under Rule 51, Ala.R.Civ.P., we find that any such "abstractness" was remedied by the court's oral charge. Murray v. Alabama Power Co., 413 So.2d 1109 (Ala. 1982).
Crigler also objects to a number of charges on the grounds that they contain incorrect statements of law and are not supported by the evidence. Rule 51, Ala.R.Civ.P., provides, in part:
 "No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection. Submission of additional explanatory instructions shall not be required unless requested by the court."
Ala.R.Civ.P., Rule 51.
This Court has stated that the purpose of stating grounds for objection is to give the trial court the opportunity to correct the instructions and to avoid the waste of time from reversals that result from technical omissions or oversights. Gardner v.Dorsey, 331 So.2d 634 (Ala. 1976). After examining the record in this case, we find that Crigler did not assign grounds *Page 1384 
specifying wherein the complained of charges were erroneous or misstatements of the law. Crigler's objection that numerous charges contained incorrect statements of law, without more, did not adequately inform the trial judge of any potential error or afford him an opportunity to correct any such error. Nor does this case come within the exception to this requirement that is applicable where a party makes a specific objection to a charge which misstates substantive law.Louisville Nashville Railroad Co. v. Garrett, 378 So.2d 668
(Ala. 1979).
Crigler also argues that the trial court erred in allowing plaintiffs' sixth amended complaint, which was served on him on the first morning of the trial. The sixth amended complaint added, as a cause of action, negligence and wantonness of a warehouseman. Crigler acknowledges that the provisions of Rule 15, Ala.R.Civ.P., regarding amended and supplemental pleadings, are to be liberally construed. He argues, however, that he was unduly prejudiced by the allowance of that amended complaint, which added a new theory of recovery, on the day of trial. He submits that, because the complaint was served on the morning of the trial, he was precluded from presenting an adequate defense.
This Court has frequently recognized the permissive approach to the right to amend provided by Rule 15, and the broad discretion of the trial court in determining what "the interests of justice" require. Bracy v. Sippial Electric Co.,379 So.2d 582 (Ala. 1980); McElrath v. Consolidated Pipe andSupply Co., 351 So.2d 560 (Ala. 1977). See Hughes v. Wallace,429 So.2d 981 (Ala. 1983) (Torbert, C.J., concurring in result). The Committee Comments to Rule 15 state:
 "Under the rule it will be entirely irrelevant that a proposed amendment changes the cause of action or the theory of the case or that it states a claim arising out of a transaction different from that originally sued on or that it caused a change in parties. . . . Normally, an amendment should be denied only if the amendment would cause actual prejudice to the adverse party."
In Bracy v. Sippial Electric Co., 379 So.2d 582, 584 (Ala. 1980), we stated:
 "Where an amendment merely changes the legal theory of a case or adds an additional theory, but the new or additional theory is based upon the same set of facts and those facts have been brought to the attention of the other party by a previous pleading, no prejudice is worked upon the other party."
Although the sixth amended complaint adds issues not raised in the original complaint, the causes of action in the sixth amended complaint are based on the same set of facts that were pleaded in the original complaint and the prior amendments filed thereto. Plaintiffs alleged that Crigler and Collateral Control had taken control of the grain, were storing the grain, and had failed to pay plaintiffs for their grain. Plaintiffs also alleged in the original complaint that defendants were charging a storage fee.
We note that one remedy available to defendants would have been a request for a continuance. There is no evidence in the record that defendants made such a request. In conclusion, we cannot say that Crigler suffered actual prejudice; therefore, the trial court did not abuse its discretion in allowing the amended complaint.
We have carefully considered all the issues raised by Crigler in his appeal from the judgment of the trial court on the jury verdict for plaintiffs against him. We do not find any prejudicial error which would require reversal of the trial court's judgment. Accordingly, the plaintiffs' judgment against defendant Crigler is affirmed.
Next, we address Crigler's claim that the trial court erred in granting Collateral Control's motion for judgment notwithstanding the verdict on the cross-claim for indemnity. The basis for Collateral Control's judgment notwithstanding the verdict on its cross-claim against Crigler is the "Inventory Certification Control Service Agreement" between Modern Mix and Collateral Control, which contained an agreement captioned "Supplemental Agreement." This agreement, in pertinent part, provides: *Page 1385 
 "In consideration of the execution by COLLATERAL CONTROL CORPORATION (COLLATERAL CONTROL) of the Inventory Certification Control Agreements and Leases and such other related agreements with MODERN MIX, INC. (COMPANY) we, the undersigned, as officers, agents, directors, or shareholders, or partners, or as a person or persons otherwise interested in COMPANY obtaining the benefits of COLLATERAL CONTROL'S Inventory Certification Control Services, hereby unconditionally agree jointly and severally, personally and individually, to defend, indemnify and hold COLLATERAL CONTROL harmless from and against any and all financial loss or any other loss, damage, claim, legal liability or other expense including, but without limitation, attorneys fees and interest expense resulting directly or indirectly from any of the acts or omissions of COMPANY, its officers, agents or employees whether such acts shall be consummated directly or in connivance with others.
 "It is agreed by the undersigned that this Supplemental Agreement shall remain in full force and effect notwithstanding any changes, amendments or modifications to said Agreements and Leases and the undersigned hereby waives the right to have notice of any such changes, amendments or modifications.
 "It being further understood that the said Agreements will be executed by COLLATERAL CONTROL only on the condition that this Agreement will be executed by the undersigned."
It is undisputed that Crigler signed the agreement in question.
We initially note the proper standard of review:
 "A motion for judgment notwithstanding the verdict tests the sufficiency of the evidence in the same way as does the motion for directed verdict at the close of all the evidence. Ala.R.Civ.P. 50, Committee Comments. Granting the motion for judgment notwithstanding the verdict says, without weighing the credibility of the evidence, there can be but one reasonable conclusion from the evidence as to the proper judgment. . . .
 "When reviewing the propriety of a trial court's order granting a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the party who secured the jury verdict. . . . Such motion should be denied if there is any conflict in the evidence for the jury to resolve and the existence of such conflict is to be determined by the scintilla rule."
Hanson v. Couch, 360 So.2d 942, 944 (Ala. 1978). Guided by the above-stated principles, we are of the view that the trial court erred in granting the motion for judgment notwithstanding the verdict.
The trial court did not find that the jury verdict in favor of Crigler on Collateral Control's cross-claim was inconsistent. The general rule in Alabama, subject to exceptions, is that joint tortfeasors are not entitled to indemnity or contribution. Parker v. Mauldin, 353 So.2d 1375
(Ala. 1977). The judgment notwithstanding the verdict entered by the trial court must mean that it found either that some exception to the rule barring indemnity among joint tortfeasors applied so that Collateral Control would be entitled to be indemnified for the full amount of the judgment, or that the parties intended by the agreement to indemnify Collateral Control against loss caused by its own negligence.
Some exceptions to the rule that indemnity will not be allowed among joint wrongdoers are that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the proximate or primary cause of the injury.Mallory S.S. Co. v. Druhan, 17 Ala. App. 365, 84 So. 874 (1920). See 42 C.J.S. Indemnity § 27 (1944). The trial court instructed the jury that if they found from the evidence that Collateral Control unlawfully "intermeddled" grain that belonged to the plaintiff *Page 1386 
then they could find Collateral Control liable for conversion.
Collateral Control leased space from Modern Mix on the company's premises. Modern Mix agreed to provide personnel to conduct Collateral Control's operations, and to make available to Collateral Control all of its business records. Collateral Control had the right to restrict all deliveries from Modern Mix's inventory by any means deemed necessary, upon the occurrence of certain conditions. Modern Mix further agreed not to remove inventory from the premises except under the instruction given by BTNB to Collateral Control. Lease agreements between Modern Mix and Collateral Control also provided that the parties agreed that Collateral Control had the right to enter and leave the leased premises at all times during the lease and to use the equipment of Modern Mix for the "handling, storing, weighing, receiving, packing, shipping, or delivery of property deposited." Plaintiffs also point out that Collateral Control had its locks on all the grain bins, that Collateral Control had exclusive control of those locks, and that Crigler testified that he had to get the permission of the bonded agents to remove any inventory. There is also evidence that Collateral Control's bonded agents certified farmer-owned grain as being company owned. This evidence is sufficient to find that Collateral Control participated with Modern Mix in converting plaintiffs' grain.
Viewing the evidence most favorably to Crigler, we are unable to say that there was no conflict in the evidence for the jury with respect to the nature of Collateral Control's liability. We believe that the jury could find that Collateral Control was a joint tortfeasor, and as none of the exceptions to the rule of non-indemnity apply, Collateral Control should not be entitled to indemnity from Crigler.
This Court has held that indemnity agreements that clearly indicate an intention to indemnify against the consequences of the indemnitee's negligence are enforceable. Industrial Tile,Inc. v. Stewart, 388 So.2d 171 (Ala. 1980); Mitchell v. Moore,406 So.2d 347 (Ala. 1981). In construing indemnity contracts between private parties, this Court has required that "the intention to indemnify the negligence of the indemnitee must clearly appear from the wording of the instrument." Eley v.Brunner-Lay Southern Corp., Inc., 289 Ala. 120, 266 So.2d 276
(1972).
In Industrial Tile, the agreement at issue indemnified the "active, passive, affirmative, sole or concurrent negligence or breach of any statutory duty, whether non-delegable or otherwise on the part of the owner [indemnitee] or its agents, servants or employees, or liability therefor imputed as a matter of law to the owner. . . ." 388 So.2d at 175. This Court held that the contract did not, as a matter of law, fail to meet the clear indication test. The agreement here indemnifies Collateral Control from losses etc. "resulting directly or indirectly from any of the acts or omissions of Company [Modern Mix, Inc.], its officers, agents, or employees. . . ." We find that this agreement does not clearly indicate an intention to indemnify against the negligence of the indemnitee, Collateral Control. Collateral Control, therefore, would not be entitled to indemnity from Crigler for losses resulting from its own negligence.
For the reasons stated above, we do not think the evidence in Collateral Control's cross-claim for indemnity was so conclusive as to allow the trial court to set aside the jury verdict and substitute its own judgment in lieu thereof. Accordingly, the judgment in favor of Collateral Control on the cross-claim entered pursuant to the order granting its motion for judgment notwithstanding the verdict is reversed and the case remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
All Justices concur. *Page 1387